**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 01-11364

---

GARY LEE HATFIELD; ET AL.,

                                             Plaintiffs,

GARY LEE HATFIELD,

                                    Plaintiff-Appellee,


VERSUS


WAYNE SCOTT, ETC.; ET AL.,

                                             Defendants,

WAYNE SCOTT, EXECUTIVE DIRECTOR
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,

                                    Defendant-Appellant.

---

Appeal from the United States District Court
For the Northern District of Texas, Lubbock Division

---

September 11, 2002

Before JOLLY, DeMOSS, and PARKER, Circuit Judges

ROBERT M. PARKER, Circuit Judge:

    Appellant Wayne Scott appeals the district court's denial of his motion for summary judgment.  We reverse and remand.

**I.  Background.**

    Appellee Gary Lee Hatfield is an inmate of the Texas Department of Criminal Justice ("TDCJ") who, as a prisoner since

1

September 1997, opened an inmate trust account to be able to make purchases in the prison commissary. Inmates are not allowed to carry cash for that purpose, or any other.

These individual trust accounts are centrally managed by TDCJ's Inmate Trust Fund Department. They are used solely for the purpose of allowing inmates to make commissary purchases and are funded by the periodic deposit of money by the inmate's arrangement. The accounts are not intended to be a substitute for a savings account at a financial institution. Before opening an account, an inmate is informed that no interest is paid to the inmate on the account and that by depositing funds into an account controlled by the Inmate Trust Fund Department, they and their depositors agree to abide by the rules governing the establishment of the account.

Inmates are not required to open an account. Inmates who do open an account are encouraged to only keep a sufficient balance in it to cover their day-to-day commissary expenses. Those who keep an excessive balance are cautioned via their monthly account statements that interest is not paid on trust fund account balances and that they should consider depositing excess funds in a savings account of their choice. Those few inmates who keep an account balance of $1000 or more receive a specific notice quarterly.

The inmate trust fund was established under TDCJ Administrative Directive 14.62, as authorized under TEX. GOV'T CODE § 501.014. Under the terms of the fund, interest accruing to the

fund is used to offset the cost of maintaining the consolidated accounts. If excess interest is earned above the cost of maintenance, it is invested in United States Treasury bills and any interest earned is appropriated to TDCJ to partially fund the cost to operate the Inmate Trust Fund Department. For the year ending August 31, 2001, however, only $199,438.59 was earned in interest on the consolidated account, which totaled $11,606,800, and the fees assessed on the TDCJ to maintain the account amounted to $228,627.25. The cost of operating the Inmate Trust Fund Department was $871,971 and the interest earned on the already-accrued Treasury bills was only $738,839.68. Individual inmates are not charged any fee to maintain their own trust fund accounts. Without such accounts, inmates would be unable to purchase the items that the TDCJ makes available in the commissary on a day-to-day basis.

Hatfield sued the TDCJ and Scott under 42 U.S.C. § 1983 for a violation of the Takings Clause of the Fifth Amendment because interest is not paid to his account. Scott moved for summary judgment on Eleventh Amendment immunity grounds in September 2000.

On September 20, 2001, the district court issued a brief Order denying Scott's motion for summary judgment "because genuine issues of material fact remain and Respondent Scott has failed to demonstrate that he is entitled to judgment as a matter of law." A similar lawsuit by another prisoner, Billy Ray Cinnamon, was consolidated with Hatfield's at the same time. Scott then filed

this interlocutory appeal.

## II. Jurisdiction.

We first must determine whether we have jurisdiction to consider this interlocutory appeal. Ordinarily, denial of a summary judgment motion does not provide grounds for federal appellate review under 28 U.S.C. § 1291 because it is not a final judgment. *Palmer v. Johnson*, 193 F.3d 346, 350 (5th Cir. 1999). A district court's denial of qualified immunity on a motion for summary judgment is immediately appealable under the collateral order doctrine, however, if it is based on an issue of law. *Palmer*, 193 F.3d at 350 (citing *Johnson v. Jones*, 515 U.S. 304 (1995) and *Mitchell v. Forsyth*, 472 U.S. 511 (1985)). If the denial is based on a genuine issue of material fact, it is not appealable. *Palmer*, 193 F.3d at 351; *Naylor v. State of Louisiana, Dep't of Corrections*, 123 F.3d 855, 857 (5th Cir. 1997)(*per curiam*).

Regardless, appellate review of an issue of law is not precluded because the district court determined that there are also genuine issues of fact. "[T]o the extent that a district court order denying qualified immunity determines an issue of law, such an order is appealable in spite of the existence of genuine issues of material fact." *Naylor*, 123 F.3d at 857 (citing *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *Coleman v. Houston Independent School District*, 113 F.3d 528, 531 (5th Cir. 1997)). When

4

reviewing the purely legal question of whether the plaintiff alleges a violation of a clearly established right of which a reasonable person would have known, "we can review the *materiality* of any factual disputes, but not their *genuineness*." *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000)(emphasis in original)). "In making this legal determination on the materiality of the facts at issue, we review the complaint and record to determine whether, assuming that all of [Plaintiff's] factual assertions are true, those facts are materially sufficient to establish that defendants acted in an objectively unreasonable manner." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 341 (5th Cir. 2001).

Hatfield argues that we are limited to determining whether the district court properly denied qualified immunity to Scott without addressing the merits of the case. Under the framework just set forth, we must review the facts of the case as they apply to a determination under law whether there was a violation of some constitutional or statutory right fueling Hatfield's claim.

The district court did not file a memorandum opinion providing its analysis of Scott's motion for summary judgment. The court did, however, file an order that stated in full:

> The Court has considered Respondent Scott's Motion for Summary Judgment and finds that it should be denied in all things because genuine issues of material fact remain and Respondent Scott has failed to demonstrate that he is entitled to judgment as a matter of law.

*See Hatfield v. Scott*, No. 5:99-CV-200-C (N.D. Tex. Sept. 20,

5

2001). Scott argues that Hatfield does not have a property interest in the interest on his Inmate Trust Account, that using the interest in the manner that TDCJ uses it does not violate the Takings Clause of the Fifth Amendment, and that Hatfield is compensated for such use, all as a matter of law. To the extent that the district court considered those issues of law when deciding Scott's motion for summary judgment, we may examine whether there existed a violation of Hatfield's constitutional rights, while reviewing the materiality of the facts in the record. Therefore, we hold jurisdiction over this appeal.

## III.  Standard of Review.

We review *de novo* a district court's denial of a summary judgment motion, including those ruling on claims of qualified immunity. *Chiu*, 260 F.3d at 342. We do not apply the same FED. R. CIV. P. 56(c) standard as the district court because we do not determine whether the record establishes genuine factual issues. *Compare Wagner*, 227 F.3d at 320 (review of *materiality* of factual issues is permitted, but not their *genuineness*), *supra*, *with Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000)("summary judgment will be affirmed only when [we are] convinced, after an independent review of the record, that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.")(Internal quotations omitted). The proper inquiry here is whether the district court was correct in determining that

6

the facts alleged by Hatfield were *materially* sufficient to establish that Scott's conduct was objectively unreasonable in light of the requirements of the Takings Clause of the Fifth Amendment.  This inquiry is purely a legal one.

## IV.  Analysis.

The Fifth Amendment, made applicable to the States through the Fourteenth Amendment, provides that "private property" shall not "be taken for public use, without just compensation."  *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 163-64 (1998).  The existence of a property interest is determined not by the Constitution itself, but by reference to "existing rules or understandings that stem from an independent source such as state law."  *Id.* at 154 (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972)).

Hatfield relies heavily on *Phillips*[1] to argue that he has a property interest in the interest attributable to his inmate trust account, which was created under Texas state law.

> The [TDCJ] shall take possession of all money that an inmate has on the inmate's person or that is received with the inmate when the inmate arrives at a facility to be admitted to the custody of the department and all money the inmate receives at the department during confinement and shall credit the money to an account created for the inmate.  The department may spend money

---

[1]  Holding that interest paid on specified lawyers' clients' trust accounts, which was used under the Texas Interest on Lawyers Trust Accounts ("IOLTA") program to fund legal services for indigents, was the private property of the owners of the principal under the rule that "interest follows principal."  524 U.S. at 172.

7

from an inmate account on the written order of the inmate in whose name the account is established or as required by law or policy subject to restrictions on the expenditure established by law or policy. The department shall ensure that each facility operated by or under contract with the department shall operate an account system that complies with this section, but the department is not required to operate a separate account system for or at each facility.

TEX. GOV'T CODE § 501.014(a). Under this statute, the TDCJ implemented policy under TDCJ Administrative Directive 14.62, establishing the Inmate Trust Fund and its individual accounts. TDCJ and Scott claim that this authorization does not establish an inmate's property interest in any interest accruing to the trust fund.

Prisoners have brought § 1983 suits against state agencies for withholding inmate account interest before, the outcome of which generally has hinged on whether a state-created interest exists. In *Schneider v. California Dept of Corrections*, 151 F.3d 1194 (9th Cir. 1998), the Ninth Circuit examined CAL. PENAL CODE § 5008, which provided that the State "may deposit such funds in interest-bearing bank accounts" and that, if it does so, it "shall deposit the interest or increment accruing on such funds in the Inmate Welfare Fund." *Schneider*, 151 F.3d at 1196. The California district court had determined that, under § 5008, an inmate had no property interest in the interest accumulated in his account. Instead, it ruled that "inmates in California do not have a protected property interest in the interest income earned on Inmate Trust Accounts and

8

that they are not deprived of earning interest on the funds because they can elect to place their money in a Passbook Savings Account." It further ruled that, therefore, there was no claim stated for violation of the Fifth Amendment Takings Clause. *See Schneider v. California Dep't of Corrections*, 957 F. Supp. 1145, 1149 (N.D. Cal. 1997). The court later denied the prisoner's application for leave to file a motion for reconsideration.

The Ninth Circuit reversed. Although that court observed that the California statute did not create a property interest,[2] it went on to rule that an explicit statute is not necessary to create a property right. *Schneider*, 5 F.3d at 1199. Analyzing *Phillips* and *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1908),[3] the Ninth Circuit applied the "interest follows principal" rule to find a protected property interest in earned interest income. Identifying a "core" notion of constitutionally protected property not subject to state regulation without Takings Clause scrutiny, 151 F.3d at 1200, the Ninth Circuit found "little doubt that

---

[2] The Ninth Circuit factually distinguished this point from its earlier decision in *Tellis v. Godinez*, 5 F.3d 1314 (9th Cir. 1993). There, a Nevada statute specifically provided that interest and income earned on a prisoner's fund created under the statute must be credited to that fund. *Schneider*, 151 F.3d at 1198–99.

[3] Holding that, despite the explicit wording of a Florida statute that interest accruing on lawyers' clients' interpleader accounts would be deemed income to the office of the clerk of the circuit court, the rule of "interest follows principal" applied and that such interest was to be allocated to those who are ultimately to be the owners of that principal. 449 U.S. at 162.

interest income of the sort at issue here is sufficiently fundamental that States may not appropriate it without implicating the Takings Clause." *Id*. at 1201. In reversing, the court limited its order on remand to permitting discovery as to whether interest actually accrued on the prisoners' trust accounts and, if so, to allow the prisoners to amend their complaint to proceed with a Takings Clause claim. *Id*.

The Fourth Circuit has taken the opposite view. In *Washlefske v. Winston*, 60 F. Supp. 2d 534 (E.D. Va. 1999), a district court found that, despite the explicit language of VA. CODE ANN. § 53.1-44 permitting the use of prisoners' accounts interest in a general fund for the benefit of all prisoners, under *Phillips* and *Webb's*, prisoners' property interest existed in the interest income earned on wages paid for work in prison that were placed in prison-managed accounts. *Id*. at 538. The district court went on to rule that, regardless, there was no taking without just compensation because, first, the prisoner voluntarily chose to place funds in the account administered by the prison and, second, the prisoner received just compensation in the form of benefits such as books, recreation equipment, and no imposition of administrative fees for managing the account. *Id*. at 543.

The Fourth Circuit affirmed on different grounds, finding that the prisoner had no property interest in the interest income. *Washlefske v. Winston*, 234 F.3d 179, 186 (4th Cir. 2000). In

10

reaching that conclusion, the court noted that the Takings Clause protects private property, but does not create it. *Id*. at 183 (citing *Phillips*, 524 U.S. at 163). It thus looked outside the Takings Clause to determine whether a constitutionally protected property interest existed. The court found that the Virginia statutes created and defined a limited property right, which did not grant full rights of possession, control, and disposition over the amounts "earned" and credited to the prisoner's account. He could not receive the wages as cash; he could either spend them on items in the prison commissary or direct that they be sent outside of prison to other persons or for the purchase of other approved items. 234 F.3d at 185. Use of the interest earned was at the sole discretion of the Director of the Department of Corrections. *Id*. The court held that no deprivation of a preexisting property right had occurred; instead, limited property rights for penological purposes had been created. *Id*. It noted that though interest follows principal at common law, it does so only incident to the ownership of the underlying principal. *Id*. (citing *Phillips*, 524 U.S. at 164). Under Virginia common law, the prisoner had no traditional private property interest in the wages earned in prison. 234 F.3d at 185-86. Thus, there was no traditional principle of property law in Virginia upon which the prisoner's claim could rest. *Id*. The Fourth Circuit did not address the Virginia district court's opinion regarding the

11

prisoner's voluntary choice of where to place his funds or the compensatory benefit received from the inmate account program.

In an unpublished opinion,[4] the Tenth Circuit has held that an Oklahoma prisoner, who brought a similar § 1983 suit, had no constitutionally protected property interest in interest earned on funds in his inmate's accounts. *See Petrick v. Fields*, 103 F.3d 145, 1996 WL 699706, at **1 (10th Cir. Dec. 6, 1996). That court did so on the basis that Oklahoma law either did not provide for or explicitly denied a right to earned interest, depending on the nature of the account, and that no other independent source granted a protected property interest. *Id*. at **2.

Here, the Texas statute does not explicitly direct that interest earned on the Trust Fund be used in the manner employed by TDCJ. Instead, it permits TDCJ to establish policy regarding the use and expenditure of funds within the fund. Thus, the statute is different from those examined by our sister circuits. Regardless, we need not determine whether the Texas statute establishes a property interest because Hatfield waived any such interest as may have existed and the earned money interest properly was paid to the TDCJ to manage the Trust Fund.

The policy implemented by the TDCJ in its Administrative Directive 14.62 is to use earned interest in the fund to pay for

---

[4] We examine the Tenth Circuit's unpublished opinion as persuasive authority aiding us in the determination of this case in accordance with 10TH CIR. R. 36.3(B).

12

the cost of administering the fund. It is only after all such costs – including the fees of the financial institutions and the TDCJ's in-house costs such as staff overhead – that any leftover funds are applied to provide items for the general welfare of the prisoners. In the most recent year, the total accrued interest did not cover TDCJ's operating expenses.

The Supreme Court has indicated that this use may be appropriate. In the Texas IOLTA case, the Court explained that a State's having mandated the accrual of interest does not mean it is entitled to assume ownership of it. *Phillips*, 524 U.S. at 171. It went on to say that "[t]his would be a different case if the interest income generated by IOLTA accounts was transferred to the State as payment 'for services rendered' by the State" and that a State is not prohibited from imposing reasonable fees it incurs in generating and allocating interest income. *See id*. We think that such is the case here and that, as a matter of law, where earned interest is used to pay for the administration of a fund providing a benefit to prisoners, there is no "taking" violative of the Fifth Amendment.

Even more compelling is that Hatfield, and TDCJ prisoners in general, *choose* whether to participate in the Inmate Trust Fund. Both *Phillips* and *Webb's* dealt with interest accrued to clients of lawyers under schemes mandating how the clients' principals would be deposited and how such interest would be used. As such, the

13

deposits were involuntary. Here, a prisoner chooses whether to participate in the Trust Fund by opening an individual account and having money deposited into it. The prisoner has the option of keeping money in an interest-bearing account; in fact, the TDCJ urges prisoners to keep only the minimum amount in the inmate account consistent with the prisoner's use of the commissary. We agree with the district court in Virginia that such a knowing choice obviates any question of whether a "taking" exists, regardless of the potential existence of a property interest. *Washlefske*, 60 F. Supp. 2d at 543.

An individual may waive a constitutional right. "The classic description of an effective waiver of a constitutional right is the 'intentional relinquishment or abandonment of a known right or privilege.'" *See Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999)(quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *Bueno v. City of Donna*, 714 F.2d 484, 492 (5th Cir. 1983)(also quoting 304 U.S. at 464). Constructive consent to a waiver is not generally associated with the surrender of constitutional rights. *Coll. Sav. Bank*, 527 U.S. at 681. Instead, "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights. *Id*. at 682 (quoting *Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393 (1937)). The record must reflect a basis for the conclusion of actual knowledge of the existence of the right or privilege, full

14

understanding of its meaning, and clear comprehension of the consequence of the waiver. *Bueno*, 714 F.2d at 493.

Hatfield agrees that he was fully informed of the requirements to open an inmate trust account, including the apportionment of any interest, in accordance with TDCJ Administrative Directive 14.62[5] before he opened his account. He also was informed that he could elect to have his money deposited in an interest-bearing account as an alternative. He was informed by his monthly account statements that he would earn no interest on any money kept in the inmate trust account and that he should deposit any money in excess of his day-to-day needs in a financial institution providing interest. He elected, with full knowledge and intent, to open his inmate trust account and to thereby abandon any interest that might accrue to it.[6] It cannot be said that he was a victim of a constructive waiver, nor that he did not make an intelligent choice armed with the knowledge of the consequences of his decision. The choice between being able to earn interest and being able to purchase goods in the prison commissary may seem somewhat draconian. Hatfield, however, has not alleged that commissary access was required for any necessity so as to force him to participate in the

---

[5]  By his response brief to Scott's appeal, "Hatfield accepts the Statement of Facts set forth in Scott's Brief insofar as they refer to his particular claims for entitlement to relief by his Petition."

[6]  The sum total of all interest that would have accrued to Hatfield's account from the time of his incarceration to the time of the lawsuit would have been less than $15.

inmate trust account. The fair reading of these facts makes clear that Hatfield exercised his power of waiver over any constitutionally protected property interest that he may have had. As a matter of law, then, the facts alleged by Hatfield are not materially sufficient to establish that Scott's conduct was objectively unreasonable because there was no "taking" and hence no violation of the Fifth Amendment.

**V. Conclusion.**

Because there is no effective taking, there is no constitutional basis for a § 1983 claim. We therefore REVERSE and REMAND this case to the district court with directions to enter judgment consistent with this opinion.